[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On December 18, 1997, the plaintiff, Lucid, Inc., formerly known as AMS Manufacturing, Inc. (Lucid), filed a one count complaint against the defendant, DiSanto Technology, Inc., formerly known as DiSanto Machine and Tool Company, Inc. (DiSanto), which complaint Lucid revised on March 12, 1998. In its revised complaint, Lucid alleges that there is a balance due of $64,830 for unpaid invoices resulting from purchase orders issued by DiSanto. On August 3, 1998, DiSanto filed an answer, setoff, special defenses and a five-count counterclaim. On August 31, 1998, Lucid filed a CT Page 14426 motion to strike the portions of setoff and special defenses and the claim for attorney's fees from DiSanto's pleadings. The court,Corradino, J., granted the motion to strike on October 5, 1998. On September 29, 1998, DiSanto filed a revised answer, setoff, special defenses, and a five-count counterclaim. Counterclaims by defendant amount to five. It is the Court's opinion that all should be combined into one claim. On October 28, 1998; Lucid filed an answer to the counterclaim. On April 19, 1999, DiSanto filed an answer to Lucyd's special defenses. On April 4, April 11, and May 16, 2000, the parties had a trial before the court, Mancini, J. On July 24, 2000, the parties filed post-trial memoranda of law.
In its revised complaint, Lucid alleges, and DiSanto admitted at trial, that the parties had some business dealings with each other prior to the transactions at issue. On or about July 25, 1996, DiSanto issued three purchase orders, numbered 1311, 1312 and 1341 to Lucyd, requiring Lucyd to make 66 duplicate parts of 12 different shapes and to provide, as soon as possible, 12 duplicate sets of each shape and the remaining 648 parts thereafter. These purchase orders required Lucyd to machine posts and bases from the materials supplied by DiSanto and, subsequently, for additional consideration Lucyd agreed to assemble the parts. Upon completion of the work requested in the purchase orders, Lucyd invoiced DiSanto. DiSanto paid for some of the work, but admits that it did not pay for other work invoiced because it believes that payment is not due and owing to Lucyd. The amount at issue is $64,830. In its revised complaint, Lucyd alleges that, in failing to pay the $64,830 invoiced, DiSanto breached its contract with Lucyd and Lucid incurred damages as a result of DiSanto's failure to pay.
In its revised answer, setoff, special defenses and counterclaims, DiSanto asserts as a special defense that any amounts Lucid claims are due to it from the contract must be offset by the amounts due to DiSanto from Lucid for defective parts and lost profits. In addition, DiSanto incorporates each count of its counterclaim and realleges the counterclaim as a special defense. Resolution of these special defenses and the counterclaims will determine, in turn, the amount, if any, Lucid is owed from its performance of the contracts.
In the first count of the counterclaim, DiSanto alleges that Lucid breached the parties' contracts. DiSanto further alleges that its ultimate customer rejected the parts assembled and completed by Lucid and refused to pay DiSanto. DiSanto alleges that its ultimate customer notified it that the parts were of unusually low quality, did not meet specifications, were out of tolerance, and had slots that were not in their proper location. DiSanto alleges that it incurred expenses by way of completely inspecting every single piece of the parts assembled and CT Page 14427 completed by Lucid and suffered damages for having paid Lucid $78,981 for the parts ordered. This figure for damages by DiSanto is arrived at by adding the amount it paid for invoices in the amounts of $17,556 and $61,425.
The relationship between the parties is a relationship of general contractor and subcontractor. DiSanto has not alleged that its ultimate customer was a party to the contract between it and Lucid, or that the ultimate customer was an intended third party beneficiary. It was admitted by both parties at trial that the parties had three agreements, pursuant to which Lucid would machine parts from materials and blueprints supplied by DiSanto. Copies of the relevant purchase orders were submitted as evidence.
It is not disputed that the three purchase orders constitute valid contracts between the parties. The issue is whether the contracts were for the rendition of services or were contracts for the sale of goods. DiSanto, in its post-trial brief, assumes that the contracts between the parties are contracts for the sale of goods within the meaning of the Uniform Commercial Code (UCC), General Statutes §§ 42a-2-101 et seq. The second count of the counterclaim asserts a claim of breach of express warranty under General Statutes § 42a-2-313; the third count of the counterclaim asserts a claim of breach of implied warranty of merchantability under § 42a-2-314; and the fourth count of the counterclaim asserts a claim of breach of implied warranty of fitness under § 42a-2-315. The court must, therefore, determine first whether the contracts at issue are contracts of sales of goods governed by the UCC, or contracts for the rendition of services governed by common law principles.
Lucid argues that the UCC provisions are inapplicable in this case because the contract between the parties is a contract for work and labor, evidenced by the purchase orders and by the testimony of the parties, not a contract for the sale of goods. The court agrees with Lucid and finds that the UCC provisions are inapplicable to the contract between Lucid and DiSanto because the contract is one for the rendition of services, not for the sale of goods. The UCC only applies to transactions in goods. The UCC defines "goods" to be "all things, including specifically manufactured goods, which are moveable at the time of identification to the contract for sale. . . ." Gen. Stat. §42a-2-105 (1).
The purchase order numbered 1311 states that it is for "machine complete" and lists six lines of parts to be machined by Lucid. The purchase order also lists the "material supplied, " which was testified to be a steel rod from which the parts were to be machined. The purchase CT Page 14428 order numbered 1312 states that it is for "machine complete" and lists six lines of the parts to be machined by Lucid and also contains a note "machine base and post complete." The purchase order numbered 1341 states that it is for "machine complete," lists four lines of the parts to be machined by Lucid, contains a description of the material furnished and contains a note "machine complete, post only." These purchase orders are consistent with the testimony of both parties that Lucid was to machine certain bases and posts from the material and blueprints supplied by DiSanto. The purchase orders call for the service of machining enumerated items. The purchase orders thus describe the transactions as contracts for the rendition of service. The purchase orders do not evidence any "sale" of the parts to DiSanto within the meaning of the UCC. It is significant that there is no price breakdown for each of the items to be machined. It is obvious that the parties had agreed to perform and pay for services. The relationship between the parties was one of general and subcontractor.
"It is clear that where the contract is basically one for the rendition of services, and the materials are only incidental to the main purpose of the agreement, the contract is not one for the sale of goods under the UCC." Gulash v. Stylarama, Inc., 33 Conn. Sup. 108, 111, 364 A.2d 1221
(1975). "A contract for the furnishing of labor and materials is not a contract for the sale of goods." 77A C.J.S. 37, Sales § 4 (1994). "A contract for the rendition of services is not subject to the sales provisions of the Uniform Commercial Code." Id. "In determining whether a contract is one of sale or to provide services, the court looks to the essence of the agreement to see whether service predominates over any sale aspect, such as supply of materials by the principal to the service entity." Id. "Whether a contract is one for the sale of goods, or for work and labor to be rendered may depend on whether the primary intent is merely to provide for the delivery of goods, or whether the essential consideration is work and labor to be performed at the, employer's instance and for his use rather than for the producer's benefit." Id., p. 38.
The nature of the transactions, evidenced by the purchase orders and the testimony of the parties, shows contracts for work, labor and materials, not ones for the sale of goods. "It is of no moment that the materials to be processed was transferred from the defendant's possession to the plaintiff's: where service predominates, and the transfer of personal property is only incidental to the transaction, it is a contract for work, labor and materials and not a sale. . . . The facts here dictate the conclusion that the change in physical custody of the raw goods from the defendant to the plaintiff was incident to a bailment and not a sale." (Internal quotation marks omitted.) Manes Organization,Inc. v. Standard Dyeing and Finishing Co., 472 F. Sup. 687, 690 n. 3 CT Page 14429 (S.D.N.Y. 1979). Because the parties intended and entered into contracts for the rendition of services, not one for the sale of goods, the court finds that DiSanto cannot rely on the UCC provisions to support its special defenses and the first four counts of the counterclaim.
In the fifth count of the counterclaim, DiSanto alleges that Lucid was negligent in machining the parts. Lucid's negligent machining of the parts, DiSanto argues, is the direct legal cause of the rejection of the parts and cancellation of its contract with DiSanto by DiSanto's ultimate customer. A person may be liable in negligence for breach of a duty which arises out of a contractual relationship. Urban v. Hartford Gas Co.,139 Conn. 301, 305, 93 A.2d 292 (1952). "A mere breach of the contract would not afford a basis for recovery in tort, but the necessary elements to establish negligence must be shown." Montimeri v. Southern New EnglandTelephone Co., 175 Conn. 337, 341, 398 A.2d 1180 (1978). There is implied in every contract for work or services, a duty to perform it skillfully, carefully and in a workmanlike manner. 17A Am.Jur.2d, Contracts § 627.
"It is, of course, the burden of the [party alleging negligence] to prove the allegations of its complaint by a preponderance of the evidence, which means evidence that has more convincing force than that opposed to it." Pioneer Bldrs. v. Landie Contractors, Inc., Superior Court, judicial district of Tolland at Rockville, Docket No. 056228 (March 6, 1998, Klaczak, J.). The issue of the quality of the parts machined by Lucyd is central to DiSanto's counterclaim of negligence.
The following facts, admitted by DiSanto at trial, are relevant to determining whether Lucyd was negligent in machining the parts pursuant to the parties' contract. The blueprints provided by DiSanto required that four slots be created in the base plates by means of an electrical discharge process known as Wire EDM (EDM). The slots were an integral part of the base and were part of the discussion between the parties prior to the issuance of the purchase orders. The blueprints provided by DiSanto located the slots to be created. DiSanto knew that Lucid had neither the expertise nor the equipment to create the slots or to verify the accuracy of the location of the slots when the process was complete. Lucid had samples of each shape slotted by three EDM contractors and forwarded these samples to DiSanto for inspection and approval prior to assembly after the issuance of purchase orders, but before September 10, 1996.
On September 13, 1996, DiSanto approved the samples sent for inspection. Between September 13 and 24, 1996, Lucid submitted 169 assembled and completed parts to DiSanto. DiSanto agreed to pay $154 for each assembled and completed unit, which included a flat rate of $45 per CT Page 14430 unit for the EDM process and $9 per unit for assembly. DiSanto rejected 55 of the 169 parts delivered by Lucid because of assembly and print discrepancies and retained the remaining 114 parts. DiSanto sent 112 of the 114 retained parts to its ultimate customer, for which the parts were ordered. On November 19, 1996, Lucid invoiced DiSanto for the 114 parts retained by DiSanto in the amount of $17,556, and DiSanto paid the invoice the next day. On November 11 and 12, 1996, Lucid delivered 356 additional completed and assembled units as contracted under the two purchase orders and invoiced DiSanto a total sum of $61,425, which included $6,601 additional EDM rework charges, for reworking of the slots as requested. DiSanto paid the amount in full on February 11, 1997. By November 15, 1996, Lucid had all of the 792 contracted parts machined and slotted.
On August 8, 1996, DiSanto issued another purchase order, numbered 1341, requesting Lucid to machine 624 posts to match bases being made by DiSanto in its own shop. Lucid delivered the 624 posts on February 18, 1997. The agreed price for this additional order was $19,968. Because DiSanto never delivered the bases to Lucid so that the post stem could be machined, Lucid invoiced DiSanto a sum of $16,640, allowing a credit for the post stem machining that was not completed.
DiSanto admits receipt and nonpayment of the two invoices, numbered 97010 in the amount of $23,790 and 97011 in the amount of $24,400, respectively, allegedly for the 316 additional finished parts that Lucid delivered to DiSanto on December 19, 1996, pursuant to the first two purchase orders, numbered 1311 and 1312. DiSanto also admits receipt and nonpayment of the invoice, numbered 970147, in the amount of $16,640, pursuant to the purchase order, numbered 1341. DiSanto denies, however, that the three invoices are due or that it owes Lucid $64,830, the sum of the three outstanding invoices.
There was extensive testimony offered by both parties about the problems that arose in locating the slots on the parts. The proffered testimony shows that both Lucid and DiSanto misread the prints from which the parts were slotted. It was only after DiSanto got a computer program from its ultimate customer that it was able to accurately measure the tolerance of the slots. By this time, however, Lucid had finished machining the parts. It is also noteworthy that, even though problems were identified with the initial run of the parts Lucid machined for DiSanto, at no point did DiSanto tell Lucid to stop machining the parts. Instead, both parties provided testimony that Lucid was subject to a deadline for machining the parts.
DiSanto did not offer testimony, expert or otherwise, to explain how the work performed by Lucid was not performed "skillfully, carefully and CT Page 14431 in a workmanlike manner". See 17A Am.Jur.2d, Contracts § 627. "Under the facts of this case, in the absence of expert testimony explaining how the work performed failed to comply with that degree of care which a skilled [person] of ordinary prudence would have exercised under the same or similar conditions . . . and how that negligence caused the damages complained of, a fact finder could not properly have inferred this fact." (Citations omitted; internal quotation marks omitted.)D'Esopo Co. v. Bleiler, 13 Conn. App. 621, 625-26, 538 A.2d 719 (1988)
The facts show that Lucid did everything it reasonably could to perform the work specified in the purchase orders. Lucid made samples, approved by DiSanto, prior to completing the entire job. Lucid conferred with DiSanto about the problems found by DiSanto's inspectors and took steps to rectify those problems. Lucid submitted copies of "certificates of compliance" that were sent to DiSanto's ultimate customer with the parts, which contain the statement "[w]e hereby certify that all parts were manufactured to PO and drawing specifications and certify that all material used in the manufacturing of parts in the quantity listed below conforms to manufacturing specifications as indicated on the drawings." At no time did DiSanto tell Lucid to stop machining the parts in accordance with the purchase orders and blueprints.
The court finds that it was DiSanto's "burden to prove [its] own case by a preponderance of the evidence"; Pioneer Bldrs. v. LandieContractors, Inc., supra, Superior Court, Docket No. 056228; Irumerso v.Southern Connecticut Gas Co., Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 310860 (November 17, 1994, Levin, J.) (12 Conn.L.Rptr. 686, 688); and that DiSanto has failed to satisfy its burden. Accordingly, because the court finds that the parties had valid, enforceable contracts whereby Lucid was to machine certain parts for DiSanto, and because the court further finds that Lucid fully performed the contract and DiSanto failed to prove that Lucid's performance was negligent by a preponderance of the evidence, the court renders judgment for Lucid on its complaint. The court also renders judgment against DiSanto for all of its special defenses and counterclaim because the parties' contract was not governed by the UCC and DiSanto failed to meet its burden of proving that Lucid's performance under the contract was negligent by a preponderance of the evidence.
Judgment shall hereby enter for the plaintiff in the amount of $64,830. Attorneys' fees, though claimed, do not appear to be at issue before the court. Any claim for attorney fees may be submitted within 30 days of this judgment.
Philip E. Mancini, Jr. Judge Trial Referee CT Page 14432